RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0181P (6th Cir.)
File Name: 03a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.            No. 02-3120

STEVEN G. LONEY,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00116—Edmund A. Sargus, Jr., District Judge.

Argued: May 2, 2003

Decided and Filed: June 6, 2003

Before: NELSON and COLE, Circuit Judges; ROSEN,
District Judge.*

———————————

## COUNSEL

**ARGUED:** Gordon Hobson, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Marcia J. Harris, UNITED STATES ATTORNEY,

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

2    *United States v. Loney*        No. 02-3120

Columbus, Ohio, for Appellee. **ON BRIEF:** Gordon Hobson, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Marcia J. Harris, UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

———————————

## OPINION

———————————

ROSEN, District Judge.

## I. *INTRODUCTION*

While conducting a January 9, 2001 search, parole officers discovered an automatic rifle in the possession of Defendant-Appellant Steven G. Loney. At the time of this discovery, Defendant was on parole stemming from a 1997 felony conviction in Ohio for carrying a concealed weapon. A grand jury in the Southern District of Ohio subsequently indicted Defendant for unlawfully possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). Thereafter, Defendant filed motions to dismiss the indictment and to suppress the rifle, arguing that § 922(g)(1) is unconstitutional under the Commerce Clause and that the parole officers lacked reasonable suspicion to conduct the January 9 search. Following a suppression hearing, the District Court denied the motions and found Defendant, who had waived his right to jury trial, guilty of violating § 922(g)(1). Defendant appeals the denial of the aforementioned motions.

For the reasons set forth below, we AFFIRM the District Court's denial of both motions.

## II. *BACKGROUND*

### A. *Factual Background*

On August 1, 1998, the State of Ohio placed Defendant on parole for three years following his May 1997 felony conviction for carrying a concealed weapon. That same day,

Defendant met with his parole officer Corey Dykstra and signed a form agreeing to the terms and conditions of his parole. The form prohibited Defendant's possession or use of firearms, ammunition, or drugs, required Defendant to submit to drug testing, and provided further:

> 9. I agree to a search, without warrant, of my person, my motor vehicle, or my place of residence by a supervising officer or other authorized representative of the Department of Rehabilitation and Correction at any time. *Notice: Pursuant to section 2967.131 of the Revised Code, Officers of the Adult Parole Authority may conduct warrantless searches of your person, your place of residence, your personal property, or any property which you have been given permission to use if they have reasonable grounds to believe that you are not abiding by the law or terms and conditions of your supervision.*

[J.A. at 91].

Thereafter, Defendant repeatedly tested positive for drugs. In particular, Defendant tested positive for marijuana use in October, November, and December of 1998, after which Officer Dykstra ordered Defendant to complete substance abuse counseling at Neighborhood House. Defendant continued to use drugs during his counseling, and tested positive for marijuana on October 4 and October 25, 1999, and marijuana and cocaine on November 1, 1999. When Defendant failed to report to Officer Dykstra for a December 14, 1999 meeting, he was arrested and incarcerated for violating the terms of his parole. After serving ninety-two days of imprisonment, Defendant again was released to Officer Dykstra's supervision in May of 2000. Despite another counseling assignment for drug treatment, Defendant quickly lapsed back into drug use, testing positive for marijuana and cocaine on July 12 and positive for marijuana on July 19, 2000. After the July 19 session, Defendant ceased reporting to Officer Dykstra.

On October 19 and November 13, 2000, Officer Dykstra issued a local order for Defendant's arrest and labeled him a

violator at large, respectively. Thereafter, in an effort to locate Defendant, Officer Dykstra randomly drove by and telephoned a house owned by Defendant's mother where Defendant was known to reside. When Defendant answered a phone call to the house on January 9, 2001, Officer Dykstra promptly contacted three other parole officers, all of whom proceeded to the house with Officer Dykstra to arrest Defendant.

After telephoning the house again to confirm Defendant's presence, Officer Dykstra knocked and identified himself. When Defendant's mother opened the door, Officer Dykstra saw Defendant in the back kitchen dressed in a t-shirt and underwear. As Officer Dykstra entered the house, Defendant moved to the top of the basement stairs. Although Officer Dykstra told Defendant to stop, Defendant proceeded down the stairs, stating that he needed to get dressed. Shortly after Officer Dykstra ordered Defendant to come back upstairs, Defendant ascended the stairs, still wearing the same t-shirt and underwear. The officers then placed Defendant into custody, dressed him, and removed him to a transport vehicle outside.

After Defendant's removal from the home, the parole officers searched Defendant's bedroom, finding marijuana and ammunition. The officers then searched the basement, finding a loaded AK-47 rifle. Thereafter, Defendant was sentenced to 119 days of imprisonment for violating the terms and conditions of his parole.

### B. *Procedural History*

As recited above, on June 19, 2001, a grand jury indicted Defendant under 18 U.S.C. § 922(g)(1).[1] On July 17, 2001,

---

[1]18 U.S.C. § 922(g)(1) provides:

(g) It shall be unlawful for any person–
(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . .

Defendant filed a motion to dismiss indictment for lack of federal jurisdiction or in the alternative, based on insufficiency of evidence, arguing that § 922(g)(1) violates the Commerce Clause by not requiring a "substantial" connection to interstate commerce, and that the government lacked evidence to establish such a substantial connection. That same day, Defendant filed his motion to suppress, asserting that the parole officers lacked reasonable suspicion to conduct the January 9 search that produced the rifle. On August 27, 2001, the District Court conducted an evidentiary hearing on the motion to suppress. Officer Dykstra testified at the hearing that he based his decision to search the bedroom on "Mr. Loney's extensive drug past while under supervision and his prior conviction." [J.A. at 188]. According to Officer Dykstra, the parole officers then searched the basement "because it was where Mr. Loney went when we entered the house." [J.A. at 188]. On cross-examination, Officer Dykstra further explained his reasons for searching the basement as follows:

> He has access to that room so we went to that room. Another reason we searched that basement was because during the search of his room, we uncovered narcotics, suspected narcotics. We also uncovered ammunition. So at this point we find ammunition we are thinking: There may be a gun in this house somewhere. So the first place we looked was the basement where Mr. Loney went, and that's where we found the rifle.

[J.A. at 198].

Following the suppression hearing, the parties stipulated to Defendant's prior felony conviction and his possession of a firearm. Defendant also stipulated and agreed that:

---

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

> [T]he Norinco SKS 7.62 caliber rifle, serial number 8102741, had been shipped and transported in interstate commerce, to wit: the rifle had been manufactured in China; imported by K-Sports Imports, Inc., Pomona, California; shipped to Lew Horton Dist. Co., Inc. in Westboro, Massachusetts; and, finally shipped to Statewide Guns, Gallipolis, Ohio.

[J.A. at 66].

On November 7, 2001, the District Court denied Defendant's motion to dismiss, citing both Sixth Circuit precedent upholding the constitutionality of § 922(g) and Defendant's stipulation, quoted above, that the rifle had been shipped and transported in interstate commerce. The District Court also denied Defendant's motion to suppress, finding that the January 9 search was a valid special needs search under *Griffin v. Wisconsin,* 483 U.S. 868, 107 S. Ct. 3164 (1987), and its progeny. After finding Defendant guilty of violating § 922(g)(1), the District Court sentenced Defendant to thirty-five months of imprisonment.

## III. *ANALYSIS*

### A. *Motion to Suppress*

On appeal, Defendant renews his contention that Officer Dykstra and his fellow parole officers lacked reasonable grounds to conduct the January 9 search. Although we review the District Court's findings of fact for clear error, we review *de novo* the ultimate question of whether a search survives constitutional scrutiny. *United States v. Payne*, 181 F.3d at 781, 785 (6th Cir. 1999). When, as here, the District Court has denied a motion to suppress, "we review all evidence in a light most favorable to the Government." *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003).

#### 1. *Special Needs Searches Under* Griffin

In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164 (1987), the Supreme Court delineated the standards for

analyzing searches of probationers under the Fourth Amendment. Citing the "special need" of states to closely supervise probationers to assure the observance of probation conditions, the *Griffin* Court upheld against a Fourth Amendment challenge a Wisconsin regulation authorizing the warrantless search of a probationer's home when a probation officer has "reasonable grounds" to suspect the presence of contraband. *Id.* at 870-76, 107 S. Ct. at 3167-170. As explained by the Supreme Court, the reasonable grounds search at issue in *Griffin* "satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles." *Id.* at 873, 107 S. Ct. at 3168.

Because the special needs of parole systems mirror those of probation systems, subsequent courts logically extended the *Griffin* exception to the warrant and probable cause requirement to searches of parolees as well. *See, e.g., Payne*, 181 F.3d at 787 (citing *Griffin* for the proposition that "[i]n the context of the special needs of the parole system, the presence of a reasonable regulatory scheme can make a search upon less than probable cause 'reasonable' for purposes of the Fourth Amendment"); *United States v. Jones*, 152 F.3d 680, 685 (7th Cir. 1998) (noting that the *Griffin* principles "apply to parolees at least to the same degree as probationers").

In analyzing a special needs search of a parolee under *Griffin* and its progeny, courts conduct a two-pronged inquiry. First, courts examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. *See Payne*, 181 F.3d at 786-91; *United States v. Conway*, 122 F.3d 841, 842-43 (9th Cir. 1997). If so, courts then analyze whether the facts of the search itself satisfy the regulation or statute at issue. *Payne*, 181 F.3d at 786-91. With respect to the first prong of the *Griffin* analysis, it is now beyond question that a state statute survives Fourth Amendment scrutiny if it authorizes searches of parolees based on a reasonable suspicion that an individual is violating the terms

or conditions of parole. *Id.* at 786. As for the second prong, the reasonable suspicion standard is less stringent than the probable cause requirement. Nonetheless, it still requires that, given the totality of the circumstances, parole officers provide "'articulable reasons' and 'a particularized and objective basis'" for their suspicion of a parole violation. *Id.* at 788 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690 (1981)).

## 2. *The Search of the Bedroom and Basement*

Applying the first prong of the *Griffin* analysis, Officer Dykstra and his fellow parole officers conducted the January 9 search pursuant to an Ohio statute that authorizes searches of parolees, with or without a warrant, if a supervising parole officer has "reasonable grounds" to believe, among other reasons, that a parolee "is not complying with the terms and conditions . . . of parole." Ohio Rev. Code Ann. § 2967.131(c).[2] The parties do not dispute, and we agree, that

---

[2]Ohio law provides, in pertinent part:

During the period of a conditional pardon or parole, of transitional control, or of another form of authorized release from confinement in a state correctional institution that is granted to an individual and that involves the placement of the individual under the supervision of the adult parole authority, and during a period of post-release control of a felon imposed under section 2967.28 of the Revised Code, authorized field officers of the authority who are engaged within the scope of their supervisory duties or responsibilities may search, with or without a warrant, the person of the individual or felon, the place of residence of the individual or felon, and a motor vehicle, another item of tangible or intangible personal property, or other real property in which the individual or felon has a right, title, or interest or for which the individual or felon has the express or implied permission of a person with a right, title, or interest to use, occupy, or possess, if the field officers have **reasonable grounds** to believe that the individual or felon has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's or felon's conditional pardon, parole, transitional control, other form of authorized release, or post-release control.

Ohio's "reasonable grounds" standard mirrors the reasonable grounds standard first discussed in *Griffin,* and later characterized as the federal reasonable suspicion standard by this Court in *Payne.* Accordingly, O.R.C. § 2967.131(c) passes constitutional muster, and the validity of the special needs search in the instant case turns on the second prong of the *Griffin* analysis: namely, whether Officer Dykstra had reasonable grounds to suspect that Defendant was violating the terms and conditions of his parole. A review of the record reveals that he unquestionably did.

First and foremost, Officer Dykstra testified at the suppression hearing that he searched Defendant's bedroom because of Defendant's extensive drug past while under supervision. In point of fact, when Officer Dykstra proceeded to Defendant's residence on January 9, 2001, order of arrest in hand, he possessed extensive personal knowledge of Defendant's long history of drug abuse while on parole and under supervision. Indeed, Officer Dykstra knew that Defendant had failed at least eight drug tests since going on parole in August of 1998, including his last test in July of 2000, after which Defendant absconded from supervision. Given Officer Dykstra's personal knowledge of Defendant's drug use while on parole, we cannot imagine a scenario under which Officer Dykstra would not have reasonably suspected that Defendant was continuing to engage in illicit drug activity in violation of his parole terms and conditions.

Nonetheless, Defendant argues that this Circuit's earlier decision in *Payne, supra*, precludes a finding of reasonable suspicion in the instant case. We disagree. In *Payne*, a Kentucky state police officer in Bowling Green named Smith received an anonymous tip in August 1994 that a parolee with two prior drug convictions, who had absconded from supervision, possessed a large amount of methamphetamine in the trunk of his car. Thereafter, Smith contacted Burdette, the suspect's parole officer in Barren County, who eventually

Ohio Rev. Code Ann. § 2967.131(c) (emphasis added).

caused an arrest warrant to issue on September 23. Burdette then contacted a parole officer in Bowling Green named Duvall, who agreed to make the arrest. In turn, Duvall requested that Smith help with the arrest, which did not occur until October 4, approximately a month and a half after the tip. In the course of effecting the arrest, the officers located drugs and a digital scale, which led to the issuance of a search warrant, the discovery of an assault rifle, and the parolee's eventual conviction in federal court on a firearms charge. In finding that the officers lacked reasonable suspicion for the initial search, the majority in *Payne* first explained that a parolee's "criminal record alone does not justify a search of his or her home." 181 F.3d at 790-91. The majority then concluded that the parolee's criminal record, coupled with an unreliable and stale tip about the defendant's possession of drugs, given to a state police officer rather than the defendant's parole officer, did not create a reasonable suspicion that the parolee was engaged in illegal drug activity. *Id.*

The circumstances of the present case, however, stand in sharp contrast to *Payne*. Here, Officer Dykstra did not rely solely on Defendant's criminal firearms record. Rather, Officer Dykstra had extensive personal knowledge of Defendant's repeated drug problems, including a plethora of failed drug tests and unsuccessful treatment programs while on parole and under his direct supervision.

Moreover, Defendant's attempt to draw an analogy to the stale tip in *Payne* is simply unavailing. By arguing that Officer Dykstra's extensive knowledge of Defendant's drug use was stale because Defendant had not failed a drug test for several months, Defendant effectively asks the Court to reward him for skipping out on his parole. We decline to do so. As correctly noted by the District Court, Defendant's failure to report for parole meetings following his failed drug test in July of 2000 only served to heighten Officer Dykstra's suspicion that Defendant was continuing to engage in prohibited drug activities in violation of the terms of his parole. Unlike a tip, which becomes more and more

unreliable over time, the failure to report for parole meetings and drug tests suggests that a habitual drug user has something to hide.  Logic dictates that if Defendant had wished to negate Officer Dykstra's reasonable suspicion that Defendant was continuing to possess and use drugs, Defendant should have reported for his supervisory meetings and passed his drug tests.

Finally, unlike *Payne*, the present case does not involve overtones that regular law enforcement officers, in effect, usurped a parole officer's ability to conduct a special needs search based on less than probable cause.   In *Payne*, the arrest and search were conducted by three parole officers and three state police officers, one of whom testified that he viewed the arrest as an opportunity to have a probation/parole officer help him get into the defendant's trailer. *See* 181 F.3d at 784.  Here, Officer Dykstra and his fellow parole officers effected the arrest and search without help from the police. In short, given the totality of the circumstances, it would have been unreasonable for Officer Dykstra not to suspect that Defendant was continuing to violate his parole terms by possessing and using drugs.   Likewise, Defendant's reliance on *United States v. Carnes*, 309 F.3d 950 (6th Cir. 2002), is misplaced. In *Carnes,* police and parole officers seized audio tapes during a search immediately following a parolee's arrest.   Three months later, an Assistant United States Attorney listened to the tapes and determined that they formed the basis for a wiretapping charge.   In rejecting the government's argument that the tapes were listened to for the purpose of helping to establish a violation of the parolee's residency requirement, the majority noted the lack of record evidence supporting this theory, and that the government's failure to listen to the tapes for several months suggested some other motivation. In reaching this decision, the majority emphasized that where the government claims that special needs justify a search and seizure based on reasonable suspicion rather than probable cause, "a court must look to the 'actual motivations of individual officers.'" 309 F.3d at 960

(quoting *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 593 (2001)).[3]

Here, Officer Dykstra testified at the suppression hearing that he was motivated to search the bedroom by Mr. Loney's extensive drug past while under supervision.  In contrast to *Carnes*, the record in this case abounds with evidence -- for example, Defendant's multiple failed drug tests while on parole and under Officer Dykstra's supervision -- corroborating Officer Dykstra's proffered motivation for the January 9 search.  Moreover, Defendant has offered  no evidence casting even a scintilla of doubt on Officer Dykstra's statement that he was motivated to search the bedroom by his extensive personal knowledge of Defendant's drug use.  In sum, *Carnes* provides no basis for invalidating the search of the bedroom in this case.

Finally, there was nothing improper about the search of the basement. Officer Dykstra testified at the suppression hearing that he grounded his decision to search the basement on his knowledge of Defendant's prior concealed weapons conviction -- a conviction for which Defendant was on parole at the time of the search -- the discovery of drugs and ammunition in Defendant's bedroom, and the fact that Defendant fled to the basement when the authorities first entered the house. Without question, these undisputed and articulable facts formed a solid foundation for Officer Dykstra to reasonably suspect that there was contraband in the

---

[3]Given that *Knights* did *not* involve a special needs search under *Griffin*, but rather ordinary Fourth Amendment analysis, the *Carnes* decision's reliance on *Knights* for the proposition that courts must examine the actual motivation of officers in *Griffin* style parolee search cases is puzzling to say the least. *See Knights,* 534 U.S. at 122, 122 S. Ct. at 593 (noting that with the limited exception of *some* special needs and administrative search cases, "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").   That being said, the record in this case is devoid of any evidence suggesting that Officer Dykstra's proffered motivations for the January 9 search were pretextual.

basement in violation of Defendant's parole terms and conditions.[4]

## B. *Motion to Dismiss*

We next turn our attention to Defendant's assertion that 18 U.S.C. § 922(g)(1) is unconstitutional under the Commerce Clause because it fails to require that a felon's possession of firearms "substantially" affect interstate commerce. We review a motion challenging the constitutionality of a federal statute *de novo*. *Carnes*, 309 F.3d at 954 (citing *United States v. Smith*, 182 F.3d 452 (6th Cir. 1999)).

As acknowledged and conceded by Defendant, his constitutional argument runs counter to Supreme Court precedent and numerous decisions of this Circuit finding that § 922(g)(1) represents a valid exercise of Congress' legislative power under the Commerce Clause. *See Scarborough v. United States*, 431 U.S. 563, 97 S. Ct. 1963 (1977); *Carnes*, 309 F.3d at 954; *United States v. Chesney*, 86 F.3d 564, 568-70 (6th Cir. 1996); *United States v. Turner*, 77 F.3d 887, 889 (6th Cir. 1996); *see also United States v. Napier*, 233 F.3d 394, 401 (6th Cir. 2000) (rejecting the contention that § 922(g)(8), which uses the same commerce language as § 922(g)(1), requires the government to establish a "substantial" connection to interstate commerce). In light of these decisions, we see no reason to revisit this settled issue here.

Finally, given that § 922(g)(1) does not require a substantial connection to interstate commerce, and given that Defendant stipulated to the fact that his rifle was shipped and transported in interstate commerce -- namely, from China, to California, to Massachusetts, to Ohio -- we find wholly without merit Defendant's last argument that the Government lacked sufficient evidence to establish that Defendant's possession of the rifle "substantially" affected interstate commerce.

## IV.  *CONCLUSION*

For all of the aforementioned reasons, we AFFIRM the District Court's denial of Defendant's motions.

---

[4]The Supreme Court in *Knights,* 534 U.S. at 122, 122 S. Ct. at 593, recently upheld a police officer's warrantless search of a probationer for investigatory rather than probationary purposes because the search was supported by reasonable suspicion and the probationer had a diminished expectation of privacy resulting from his express consent to a search at any time in his probation conditions -- a consent to search similar to the consent executed by Defendant in this case. Having found in this case that the special needs search of the bedroom and basement was valid under *Griffin*, we do not reach the issue of whether the search also was valid under the ordinary Fourth Amendment analysis employed by the *Knights* Court.